## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

BRETT HENDRICKSON,

      Plaintiff,

v.                                                      No. CIV 18-1119 RB/LF

AFSCME COUNCIL 18; MICHELLE LUJAN GRISHAM,
in her official capacity as Governor of New Mexico; and
HECTOR BALDERAS, in his official capacity as Attorney
General of New Mexico,

      Defendants.

### MEMORANDUM OPINION AND ORDER

For most of his employment with the New Mexico Human Services Department (HSD), Plaintiff Brett Hendrickson was a dues-paying member of Defendant AFSCME Council 18 (the Union). Recently in *Janus v. AFSCME*, 138 S. Ct. 2448 (2018), the United States Supreme Court overruled long-standing precedent and found that the common union practice of collecting agency fees from nonunion members violates their constitutional rights. After *Janus*, Mr. Hendrickson resigned from his Union membership. He now brings suit against the Union, as well as Governor Lujan Grisham and Attorney General Balderas (the State Defendants), for violations of his First Amendment rights to free speech and free association. He seeks monetary damages for dues that he paid to the Union and declarations that the Union's dues authorization revocation policy and provisions of the related state statutory scheme are unconstitutional.

Mr. Hendrickson and the Union filed cross motions for summary judgment, and the State Defendants moved to dismiss. For the reasons discussed herein, the Court will grant the Union's motion for summary judgment, grant the State Defendants' motion to dismiss, deny Mr. Hendrickson's motion for summary judgment, and dismiss this lawsuit.

## II.     Legal Standards

### A.     Summary Judgment Standard of Review

Summary judgment is appropriate when the Court determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and citation omitted). The Court examines the record and makes all reasonable inferences in the light most favorable to the nonmoving party. *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016).

In analyzing cross-motions for summary judgment, a court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of N.M.*, 839 F.3d 888, 906–07 (10th Cir. 2016) (quotation marks and citations omitted). "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) (quotation omitted).

The Court notes that Mr. Hendrickson fails to respond to or specifically dispute the material facts set forth in the Union's motion (*see* Docs. 42; 45 at 7) or in the Union's response to his own motion (*see* Docs. 39 at 8–11; 47) in contravention of Local Rule 56. *See* D.N.M. LR-Civ. 56(b). However, Mr. Hendrickson's material facts are largely consistent with the Union's statement of facts in its own motion. (*See* Doc. 39 at 8 (citing Doc. 32 at 2–8).) Consequently, for the purposes of both motions for summary judgment, the Court will accept as true the facts as presented in the

Union's motion (Doc. 32) and response (Doc. 39).

**B.     Motion to Dismiss Standard of Review**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (quotation omitted). "To survive a motion to dismiss," the complaint does not need to contain "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**II.     Background**

Mr. Hendrickson has been employed with the HSD, a public employer, since 2001. (Docs. 21 (Am. Compl.) ¶¶ 3, 16.) He is covered by the Public Employee Bargaining Act (PEBA), N.M. Stat. Ann. §§ 10-7E-1–-26 (1978), which gives public employees the right to join—or not to join—a labor organization for the purposes of bargaining with public employers regarding the terms of their employment. N.M. Stat. Ann. §§ 10-7E-5, 10-7E-15. The Union and the State are parties to a collective bargaining agreement (CBA), and Mr. Hendrickson is a member of a bargaining unit as defined in the CBA. (Doc. 32-4 ¶¶ 3–4.) *See also* § 10-7E-13. The Union is the democratically-elected exclusive representative for Mr. Hendrickson's bargaining unit for purposes of the PEBA. (*See* Doc. 32-4 ¶ 3.) *See also* § 10-7E-14.

While New Mexico has "never required membership in the Union as a condition of public

employment" (Doc. 32 at 11[1] (citing Doc. 32-4 ¶ 6); *see also* § 10-7E-5), employees in Mr.

Hendrickson's pre-*Janus* bargaining unit were required to make a choice: pay dues and join the

Union as a member to receive full member benefits, or decline to join and pay a lower amount of

"fair share fees" as a nonmember. (Doc. 32-4 ¶¶ 7, 35, 63; Am. Compl. ¶¶ 16, 22.) *See also* 138

S. Ct. at 2459–60. At the time, these fair share fees were lawful under *Abood v. Detroit Board of

Education*, 431 U.S. 209 (1977) and the PEBA. "Represented bargaining unit employees have

never been required to become Union members nor required to publicly endorse the Union's

positions in any respect." (Doc. 32-4 ¶ 29.)

Mr. Hendrickson chose to join the Union and authorized monthly dues deductions by

signing the Union's membership agreement. (Doc. 32-4 ¶ 36.) He signed this agreement on three

occasions: originally on May 7, 2004 (*id.*; *see also* Doc. 32-4-2); in 2007 when he returned to SPD

after a short stint with a non-bargaining unit (Am. Compl. ¶¶ 17, 20; Docs. 32-4 ¶ 38; 32-4-2); and

on April 7, 2017 (Docs. 32-4 ¶ 40; 32-4-3). The membership agreement provides:

> Effective: [April 7, 2017], I authorize AFSCME Council 18 as my exclusive
> bargaining representative, and I accept membership in AFSCME Council 18. I
> request and authorize the State of New Mexico to deduct union dues from my pay
> and transmit them to AFSCME Council 18. The amount of dues deduction shall be
> the amount approved by AFSCME's membership as set forth in the AFSCME
> constitution and certified in writing to my employer. This authorization shall be
> revocable only during the first two weeks of every December, or such other time as
> provided in the applicable collective-bargaining agreement.[2]

(Doc. 32-4-3.) Thus, Mr. Hendrickson was able to resign his "union membership at any time, but

. . . he would continue to have union dues deducted from his paycheck unless he gave the Union

and the State written notice of revocation of his dues deduction authorization during the first two

---

[1] The Court cites the CM/ECF pagination of the parties' briefs, rather than the internal pagination.

[2] The Union's membership agreements have included language similar to that quoted above since at least 2004. (*See* Doc. 32-4 ¶ 8.)

weeks of December in each calendar year." (Doc. 32-4 ¶ 44.)

On June 27, 2018, the United States Supreme Court decided *Janus*. 138 S. Ct. 2448. In *Janus*, the Court examined the constitutionality of requiring nonunion state employees to pay agency fees for union representation, such as the "fair share" fees in New Mexico. *Id.* at 2459–60. It found that this practice violates nonmembers' First Amendment rights, because it "compel[s] them to subsidize private speech on matters of substantial public concern." *Id.* at 2460. The Court held, therefore, that "States and public-sector unions may no longer extract agency fees from nonconsenting employees . . . unless the employee affirmatively consents to pay. By agreeing to pay, nonmembers are waiving their First Amendment rights, and such a waiver cannot be presumed." *Id.* at 2486 (citations omitted).

On July 2, 2018, the Union sent the State Personnel Office (SPO) a letter and "asked the State to immediately stop deducting fair share fees from non-members and to immediately stop transmitting those fees to the Union." (Docs. 32-4 ¶ 65; 32-4-13.) The State and the Union "have agreed that provisions of the [CBA] that required the payment of fair share fees by non-members are now invalid and unenforceable and . . . those provisions are accordingly no longer in effect." (Doc. 32-4 ¶ 71.)

Mr. Hendrickson emailed the SPO about withdrawing his Union membership on August 9, 2018. (Docs. 33-1 ¶ 5; 33-1-1.) He filed his original complaint in this Court on November 30, 2018. (Doc. 1.) He had not contacted the Union regarding resignation or termination of his dues deductions before he filed his original complaint. (*See* Doc. 32-4 ¶¶ 43, 47.) On December 6, 2018, Ms. Connie Derr, Executive Director of the Union, wrote a letter to Mr. Hendrickson and stated:

> It has come to our attention through the filing of a lawsuit that you wish to resign your union membership and cancel your authorization for the deduction of membership dues. We have no prior record that you made any such request to the union. Nevertheless, we have processed your resignation from membership.

> Additionally, your dues authorization provides that it is revocable during the first two weeks of December each year. Accordingly, we are notifying your employer to stop further membership dues deductions.

(Doc. 32-4-5; *see also* Doc. 33-1 ¶ 7.) Mr. Hendrickson faxed a membership withdrawal letter to the Union on December 8, 2018. (Docs. 32-4 ¶ 49; 32-4-6.)

After a series of communications between Mr. Hendrickson, the SPO, and Ms. Derr, the SPO stopped deducting dues beginning with Mr. Hendrickson second paycheck in January 2019, and the Union reimbursed him for the dues mistakenly deducted after the first pay period in December 2018. (*See* Docs. 32-4 ¶¶ 50–59; 32-4-10; 32-4-12; Am. Compl. ¶¶ 35–44.) Mr. Hendrickson is not currently a Union "member and is not required to support the Union, financially or otherwise." (Doc. 32-4 ¶ 60; *see also* Am. Compl. ¶¶ 10, 42.)

## III. The Court will grant the Union's motion for summary judgment and deny Mr. Hendrickson's motion for summary judgment with respect to Count I.

In his first claim for relief, Mr. Hendrickson contends that Defendants violated his First Amendment rights to free speech and association when they refused to immediately allow him to withdraw from the Union after the Supreme Court decided *Janus*. (Am. Compl. ¶¶ 45–62.) He seeks damages and three separate declarations. (*Id.*)

### A.   Mr. Hendrickson's claim regarding fair share fees is moot.

Mr. Hendrickson seeks a declaration that N.M. Stat. Ann. § 10-7E-9(G), the statute that authorized "fair share fees" before *Janus*, is unconstitutional. (*Id.* ¶ 60.) He acknowledges, however, that the Union and SPO are no longer deducting fair share fees from nonunion employees. (*See* Docs. 32-4 ¶ 65, 70–71; 32-4-13; 32-4-17.) The Union argues that "a favorable judicial decision" on this issue would have no "effect in the real world." *Equal Emp't Opportunity Comm'n v. CollegeAmerica Denver, Inc.*, 869 F.3d 1171, 1173 (10th Cir. 2017) (citation omitted). (Doc. 32 at 15.) Mr. Hendrickson fails to respond to this argument and has thus waived this claim.

(*See* Doc. 42.) The Court agrees that this issue is moot and will grant summary judgment to the Union and deny Mr. Hendrickson's motion on this issue.

  **B. Mr. Hendrickson lacks standing to seek a declaration regarding the Union's opt-out window as it applies to other union members.**

  Mr. Hendrickson next seeks a declaration "that the Union and [Governor] Lujan Grisham cannot force public employees to wait for an opt-out window to resign their union membership and to stop the deduction of dues from their paychecks." (Am. Compl. ¶ 58.) The Court may not grant the requested relief, however, because Mr. Hendrickson "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Aid for Women v. Foulston*, 441 F.3d 1101, 1111 (10th Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (subsequent citation omitted); *see also Begay v. Pub. Serv. Co. of N.M.*, 710 F. Supp. 2d 1161, 1186–87 (D.N.M. 2010). As this lawsuit is not a class action, Mr. Hendrickson may not seek a declaration that would affect the rights of others. Thus, the Court will grant the Union's motion for summary judgment on this issue and deny Mr. Hendrickson's motion.

  **C. Mr. Hendrickson cannot show that N.M. Stat. Ann. § 10-7E-17(C) constitutes an unconstitutional violation of his First Amendment rights.**

  Mr. Hendrickson seeks a declaration that N.M. Stat. Ann. § 10-7E-17(C) violates his First Amendment rights to free speech and association "because it allowed the withholding of union dues from his paycheck until a two-week period specified in the Union agreement." (Am. Compl. ¶ 59.) This statute provides that the SPO "shall honor payroll deductions until the authorization is revoked in writing . . . in accordance with the negotiated agreement . . . ." N.M. Stat. Ann. § 10-7E-17(C). He also seeks "damages in the amount of all dues deducted . . . since he became a member" (Am. Compl. ¶ 61), or alternatively, "in the amount of all dues deducted . . . since the *Janus* ruling" (*id.* ¶ 62). The claims fail for a variety of reasons.

### 1.    Mr. Hendrickson's claim for prospective relief is moot.

Mr. Hendrickson's requested declaration regarding the opt-out window for dues revocation is not justiciable, because he has resigned from Union membership and is no longer subject to dues or the opt-out window. "[I]t is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior *of the defendant toward the plaintiff.*" *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) (quotation and citations omitted). "Hence, . . . a 'plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured [by the defendant] in the future.'" *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994), *superseded by statute on other grounds*, *Cody Labs. v. Sebelius*, 446 F. App'x 964 (10th Cir. 2011) (quotation omitted).

Mr. Hendrickson presents several arguments to show why his lawsuit is not moot. First, he cites *Fisk v. Inslee*, a similar case in which the Ninth Circuit found that the plaintiff union members' prospective relief claims were not moot because they were "the sort of inherently transitory claims for which continued litigation is permissible." *Fisk v. Inslee*, 759 F. App'x 632, 633 (9th Cir. 2019) (citations omitted). "While the facts here are very similar to *Fisk*, they differ in one significant respect: *Fisk* involved a putative class action, where prospective class members presumably remained subject to the challenged conduct." *See Stroeder v. Serv. Emp's Int'l Union*, No. 3:19-CV-01181-HZ, 2019 WL 6719481, at *3 (D. Or. Dec. 6, 2019). As Mr. Hendrickson does not bring a class action, *Fisk* is inapposite.

Mr. Hendrickson next argues that this lawsuit presents a case of "voluntary cessation," because the Union revoked his dues deduction only after he filed a lawsuit. (Doc. 33 at 15.) He relies on *Knox v. Service Employees International Union, Local 1000*, another class action in

which nonunion employees alleged that a special dues assessment was being used for political expenditures, and they sued to obtain a refund. 567 U.S. 298, 302–07 (2012). After the Supreme Court granted certiorari, the union sent a notice to the employees and promised a full refund then moved to dismiss for mootness. *Id.* at 307. The Supreme Court found that the offer did not moot the case, because the Union had not actually refunded the employees and had "include[d] a host of conditions, caveats, and confusions" regarding how the employees could request the refund. *Id.* at 308. But *Knox*, which dealt with the hypothetical refund of special assessment dues, is distinguishable from this case, which involves terms related to the expiration of the union membership agreement.[3]

Finally, Mr. Hendrickson argues that the circumstances of this case are "capable of repetition but will evade review," much like those in *Roe v. Wade*, 410 U.S. 113 (1973). (Doc. 33 at 16.) "To meet this exception to mootness," however, he must show that "there [is] a reasonable expectation that *the same* complaining party [will] be subject to the same action again." *Casad v. U.S. Dep't of Health & Human Servs.*, 301 F.3d 1247, 1254 (10th Cir. 2002) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (*per curiam*)) (emphasis added). Here, his opt-out window passed in December 2018. He is no longer a Union member, and the Union is no longer deducting dues from his paycheck. He has not alleged that he is likely to be subject to Union membership or the relevant dues policies again. Mr. Hendrickson's claim for prospective relief is moot.

### 2.    Mr. Hendrickson has not shown that the Union violated his First Amendment rights to free speech and association.

Even if Mr. Hendrickson's claims regarding the opt-out window and the dues revocation

---

[3] The Court also finds Mr. Hendrickson's argument regarding voluntary cessation disingenuous, as he filed this lawsuit on November 30, 2018 (Doc. 1), and the two-week opt-out window began the next day. The Union did not terminate the dues authorization only in response to the lawsuit, but in response to his resignation.

agreement were justiciable, they would fail. Mr. Hendrickson essentially argues that *Janus* applies retroactively to void his membership contract with the Union. (Doc. 33 at 9–10.) In *Janus*, the Supreme Court found that a union may only deduct wages from a *nonmember* if that "employee affirmatively consents to pay." 138 S. Ct. at 2486. The Court disagrees that *Janus* applies here because *Janus* concerned a *nonunion employee's* fair share fees, not a *union member's* contracted-for dues.

The Union relies on the Supreme Court's decision in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), to argue that Mr. Hendrickson cannot use *Janus* to void a valid contract on the basis of any purported violation of his First Amendment rights. (*See* Doc. 32 at 20–22.) In *Cohen*, an individual (Cohen) contracted with two newspapers to provide confidential information, but only on the condition that he would remain anonymous. 501 U.S. at 665. The newspapers accepted and published the information, but they also revealed Cohen as the source. *Id.* at 666. Cohen sued, and the newspapers argued that enforcement of the parties' agreement would violate the newspapers' First Amendment rights. *Id.* at 667–68. The Supreme Court found that the newspapers self-imposed the restrictions on their First Amendment rights to reveal the confidential source, and state law would enforce that agreement. *Id.* at 671.

"*Cohen* amounts to a statement that one can waive a constitutional right, which [Mr. Hendrickson] acknowledges is consistent with *Janus*." (Doc. 42 at 11.) He argues, however, that *Cohen* is distinguishable because "[t]here was no intervening change in the law that recognized a new right of newspapers between when the promise was made and when the case was decided." (Doc. 42 at 11.) The court in *Cooley v. California Statewide Law Enforcement Ass'n* considered this same argument and  relied on *Brady v. United States*, 397 U.S. 742, 757 (1970) to find that "an intervening change in law does not taint [the union member's] consent or invalidate his

10

contractual agreement." 385 F. Supp. 3d 1077, 1080 (E.D. Cal. 2019). The Union also cites *Brady*, a case in which the criminal defendant (Brady) entered a guilty plea rather than face a jury trial and, possibly, the death penalty. (Doc. 39 at 21 (citing *Brady*, 397 U.S. at 743).) Sometime later, the statute that would have allowed the death penalty in Brady's case was found to be unconstitutional. *See Brady*, 397 U.S. at 745–46. Brady "sought relief under 28 U.S.C. § 2255, claiming that his plea of guilty was not voluntarily given because" the now-unconstitutional statute "operated to coerce his plea . . . ." *Id.* at 744. The Supreme Court disagreed and found that "[t]he voluntariness of Brady's plea can be determined only by considering all of the relevant circumstances surrounding it." *Id.* at 749 (citations omitted). The same is true here: Mr. Hendrickson was faced with the then-constitutional choice under *Abood* to join the Union or pay fair share fees. His choice was voluntary, and he may not now void his choice after *Janus*.

Mr. Hendrickson's argument that the parties' contract is based on "mutual mistake" is similarly inapposite. (*See* Doc. 42 at 7–8.) He relies on *United States v. Bunner*, in which the criminal defendant pleaded guilty to a crime pursuant to 18 U.S.C. § 924(c). 134 F.3d 1000, 1002 (10th Cir. 1998). Three years later, the Supreme Court decided *Bailey v. United States*, 516 U.S. 137 (1995), under which the *Bunner* "[d]efendant's actions no longer constituted a" crime. *Id.* The Tenth Circuit found that the very basis of the plea agreement (the admission of criminal conduct) was frustrated, and that because the conduct no longer constituted a crime, no jury could have convicted him. *Id.* at 1004–05. Thus, the defendant could not be bound to the plea agreement. *Id.* at 1005. But as the Union notes, this case is more akin to *Brady*, where the statute was later shown to be unconstitutional, rather than *Bunner*, where the conduct itself no longer constituted a crime. In cases closer to *Brady*, the Tenth Circuit has also found that a plea agreement is not voidable. *See*, *e.g.*, *United States v. Porter*, 405 F.3d 1136, 1144–45 (10th Cir. 2005) (finding that, as in

*Brady*, a plea agreement was valid after *Booker* changed the sentencing law).

Ultimately, Mr. Hendrickson fails to point to any decision that applied *Janus* to void a union membership contract under similar circumstances. On the contrary, each court that examined this issue has rejected the claim that *Janus* entitles union members to resign and stop paying dues on their own—rather than on the contract's—terms. *See*, *e.g.*, *Oliver v. Serv. Emp's Int'l Union Local 668*, No. CV 19-891, --- F. Supp. 3d ---, 2019 WL 5964778, at *2 (E.D. Pa. Nov. 12, 2019); *Seager v. United Teachers L.A.*, No. 219CV00469JLSDFM, 2019 WL 3822001, at *1 (C.D. Cal. Aug. 14, 2019); *Smith v. Bieker*, No. 18-cv-05472-VC, 2019 WL 2476679, at *2 (N.D. Cal. June 13, 2019); *O'Callaghan v. Regents of the Univ. of Cal.*, Case No. CV 19-02289JVS (DFMx), 2019 WL 2635585, at *3 (C.D. Cal. June 10, 2019); *Belgau v. Inslee*, No. 18-5620 RJB, 2018 WL 4931602, at *5 (W.D. Wash. Oct. 11, 2018).

It is Mr. Hendrickson's voluntary choice—on three separate occasions—to contract with the Union that defeats his claim. *See Adams v. Int'l Bhd. of Boilermakers*, 262 F.2d 835, 838 (10th Cir. 1958) (noting that "[i]t is well settled that the relationship existing between a trade union and its members is contractual"). As part of the contract, he knowingly agreed that he could only revoke his dues deduction authorization during a two-week opt-out window. He does not allege that he was coerced, and the parties agree that he was not required by state law to join. He could have paid a lesser fair share fee as a nonmember, but instead he chose to join the Union. *See Oliver*, 2019 WL 5964778, at *2–3 (finding "no logic" in the plaintiff's position that "if only she had known of a constitutional right to pay nothing for services rendered by the Union—despite knowledge of her right at the time to refuse membership and pay less—she would have declined union membership completely"). Accordingly, the Court will grant the Union's motion for summary judgment on this issue and deny Mr. Hendrickson's motion.

### 3.      Mr. Hendrickson cannot show that the Union is a state actor.

Finally, even if *Janus* could be construed to compel a finding that Mr. Hendrickson had a right to immediately resign his membership and cease paying dues in contravention of the parties' contract, he would be unable "to vindicate [his] rights against the Union through a § 1983 suit because the Union was not acting under 'color of state law.'" *See Oliver*, 2019 WL 5964778, at *4. "[M]ost rights secured by the Constitution are protected only against infringement by governments." *MS through Harris v. E. N.M. Mental Retardation Servs.*, No. CIV 13-628 RB-GBW, 2015 WL 13662789, at *2 (D.N.M. June 16, 2015) (quoting *Flagg Bros. v. Brooks*, 436 U.S. 149, 156 (1978)). Mr. Hendrickson invokes the First Amendment, which "requires state action," thus he must show that the Union's "actions may 'be fairly attributed to the State.'" *How v. City of Baxter Springs, Kan.*, 217 F. App'x 787, 791 n.3 (10th Cir. 2007) (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)) (citing *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976)).

"Whether the conduct may in fact be 'fairly attributed' to the state requires a two-part inquiry." *A.M. ex rel. Youngers v. N.M. Dep't of Health*, 108 F. Supp. 3d 963, 998 (D.N.M. 2015). "'First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible.'" *Id.* (quoting *Lugar*, 457 U.S. at 937). "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* (quoting *Lugar*, 457 U.S. at 937) (subsequent citation omitted).

"Here, the conduct complained of is the collection of union dues subject to a revocation window period." (Doc. 32 at 25 (citing Am. Compl. ¶¶ 53, 55, 58).) Mr. Hendrickson frames the conduct as the "state government using the state payroll system to deduct union dues from state-

issue paychecks of state employees" pursuant to a state statute. (Doc. 47 at 6; *see also* Doc. 42 at 14–15.) For purposes of this opinion, the Court will assume Mr. Hendrickson can satisfy the first part of the inquiry—that the deprivation was caused by the state's imposition of a state statutory scheme. Given that, the Court finds that he is unable to satisfy the second part, because the Union cannot be said to be a state actor.

To determine "whether a private entity can be considered a state actor, courts must analyze the claim under four well-defined tests: (1) the nexus test; (2) the public function test; (3) the joint action test; and (4) the symbiotic relationship test." *Harris*, 2015 WL 13662789, at *3 (citing *Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013)). Mr. Hendrickson only argues that the Union is a state actor pursuant to the joint action test.[4] (*See* Doc. 42 at 15.)

"State action exists under the joint-action test if the private party is a 'willful participant in joint action with the State or its agents.'" *Youngers*, 108 F. Supp. 3d at 1001 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)). "[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." *Id.* (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995)). Mr. Hendrickson argues that there is a substantial degree of cooperation between the Union and the State because they "sat down together and negotiated the contractual terms by which they would take members' dues, and the state carried out the [U]nion's instructions . . . ." (Doc. 42 at 15.) This is similar, he contends, to *Janus*, "where the Supreme Court never questioned the matter of state action." (*Id.*)

---

[4] While Mr. Hendrickson did not argue that the Union is a state actor under the nexus test, the public function test, or the symbiotic relationship test, the Court has considered each and finds that he fails to provide evidence to establish that the Union is a state actor under any of these three tests.

The Court disagrees. First, the circumstances here are again distinguishable from *Janus* because this lawsuit involves the parties' voluntary contract, not the imposition of fair share fees on nonunion employees. In *Janus*, the nonunion employee did not have a choice under state law but to pay the fair share fees. Here, Mr. Hendrickson had a choice to pay union dues according to the contract that he voluntarily signed.

Second, Mr. Hendrickson fails to show that the State had a hand in drafting or controlling the terms of the parties' membership agreement. He claims that the CBA between the Union and the State "determine[d] when [he could] end his dues deductions." (Doc. 47 at 7.) But as the Union points out, it is the membership contract that controls the terms of the opt-out window; the CBA only "parrots the language of the private membership and dues deduction agreements." (Doc. 32 at 26 n.5.) Mr. Hendrickson fails to present any evidence to show that the State had a hand in drafting the terms of the controlling document—the membership contract. And even though the State enforced the terms of the opt-out window, the "State's mere acquiescence in a private action" does not convert the "action into that of the State." *Gallagher*, 49 F.3d at 1453 (quoting *Flagg Bros.*, 436 U.S. at 164). There is no evidence in the record from which a jury could reasonably conclude that the State jointly participated in creating the terms of the membership agreement.

Ultimately, the Court finds that Mr. Hendrickson fails to come forward with evidence necessary to show that the Union is a state actor. *See*, *e.g.*, *Belgau v. Inslee*, 359 F. Supp. 3d 1000, 1015 (W.D. Wash. 2019) (finding that the State's "obligation to deduct fees in accordance with the authorization agreements does not transform decisions about membership requirements [that they pay dues for a year] into state action") (quotation marks and citation omitted); *Oliver*, 2019 WL 5964778, at *6 (because "[t]he union's right to collect the dues is not created by the Commonwealth [but] by the union's contract with its members" and "[t]he Commonwealth's

15

role . . . is strictly ministerial, . . . the Union is not involved in state action by collecting dues"); *Cooley*, 385 F. Supp. 3d at 1082 (same).

Even if Mr. Hendrickson could show that the Union was a state actor, his claim for monetary damages would be foreclosed because the Union, in collecting his membership dues, relied in good faith on then-existing law. Every district court, and now two circuit courts, have found that the union defendants in post-*Janus* litigation have "a good-faith defense to liability for payments collected before" the Supreme Court's decision in *Janus*. *See Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31; AFL-CIO*, 942 F.3d 352, 364 & n.1 (7th Cir. 2019) (collecting cases); *Danielson v. Inslee*, 945 F.3d 1096, 1098–99 (9th Cir. 2019) (holding that "a union defendant can invoke an affirmative defense of good faith to retrospective monetary liability under section 1983 for the agency fees it collected pre-*Janus*). Consequently, the Court will grant summary judgment to Defendant with respect to the § 1983 claims for damages and prospective relief.

**IV.    The Court will grant the Union's motion for summary judgment and deny Mr. Hendrickson's motion for summary judgment with respect to Count II.**

    **A.    Mr. Hendrickson's claim is foreclosed by *Knight*.**

Mr. Hendrickson asserts in Count II that the State's recognition of the Union as the democratically elected exclusive representative for his collective bargaining unit violates his First Amendment rights to free speech and association. (Am. Compl. ¶¶ 63–73.) Specifically, he argues that because the Union is the exclusive representative for his bargaining unit—even for nonmembers such as himself—he is compelled "to associate with the Union against his will and . . . "to petition the government with a viewpoint in opposition to his own goals and priorities . . . ." (*Id.* ¶ 71.) He asks that the Court find it unconstitutional for the Union to negotiate with the State "in his name . . . ." (Doc. 33 at 23.)

The Union contends that the exclusive representation provisions of the PEBA do not implicate Mr. Hendrickson's First Amendment rights. (Doc. 32 at 27–34.) *See also*, N.M. Stat. Ann. § 10-7E-13–15. It asserts that the Supreme Court has already considered and rejected this claim in *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984). The plaintiffs there, community college faculty instructors who were not members of the union that was the exclusive representative for the faculty's bargaining unit, challenged the constitutionality of the state's exclusive representation scheme (PELRA). *Knight*, 465 U.S. at 278. Specifically, they argued that "meet and confer" sessions between the union and the employer on employment-related questions violated their First Amendment rights to speak on their own behalf. *See id.* at 274–75, 286. The Supreme Court disagreed and found that the faculty members had "no special constitutional right to a voice in the making of policy by their government employer." *Id.* at 286.

Mr. Hendrickson stresses that his claim is different, and *Knight* is inapplicable. He argues that the *Knight* case only stands for the proposition that nonunion members have "no constitutional right to force the government to listen to their views[,]" and that "he asserts a right against the compelled association forced on him by exclusive representation." (Doc. 33 at 20–21.) In other words, he "does not contest the right of the government to choose whom it meets with, to 'choose its advisors,' or to amplify the Union's voice. He does not demand" that the State listen to his views, as the *Knight* faculty sought. (Doc. 33 at 22–23.) Instead, he asks that the Court find it unconstitutional for the Union to speak on his behalf. (*Id.* at 23.) This, he argues, "compel[s] him to associate with the Union by making the Union bargain on his behalf." (*Id.* at 22.)

The Court agrees that the issue the Supreme Court decided in *Knight* was narrower than the Union cares to admit. *See Thompson v. Marietta Educ. Ass'n*, 371 F. Supp. 3d 431, 436 (S.D. Ohio 2019) (noting that *Knight* "is not directly dispositive of the claim" the plaintiff made in

*Thompson*, which was "that the very designation of the Union as [her] exclusive representative forces an association between [her] and the Union"). In discussing the question presented, however, the *Knight* "Court made broad statements about PELRA and the freedom of association." *Id.* The Court opined that the meet and confer sessions did not infringe on the faculty's speech *or* associational rights. *Knight*, 465 U.S. at 288. The statutory scheme allowing for exclusive representation "has in no way restrained [the faculty's] . . . freedom to associate or not to associate with whom they please, including the exclusive representative." *Id.* The Court reiterated that their "associational freedom has not been impaired" because they "are free to form whatever advocacy groups they like. They are not required to become members of" the union, and the pressure they may feel to join the union because of its unique position "does not create an unconstitutional inhibition on associational freedom." *Id.* at 289–90.

Thus, while the ultimate issue the *Knight* Court considered does not squarely align with the issue presented here, the Court finds that language in the decision is directly on point and dispositive of this claim. "Indeed, every court that has considered [whether an exclusive representation arrangement] forces [nonunion members] into an expressive association with [unions] has rejected [the argument] as foreclosed by *Knight*." *Thompson*, 371 F. Supp. 3d at 437 (citing *Hill v. Serv. Emps. Int'l Union*, 850 F.3d 861, 863 (7th Cir. 2017) ("rejecting claim that designation of exclusive representative forced employees into an 'agency-like association with the [union]'" and finding that, "under Knight, the IPLRA's exclusive-bargaining-representative scheme is constitutionally firm and not subject to heightened scrutiny"); *Jarvis v. Cuomo*, 660 F. App'x 72, 74 (2d Cir. 2016) ("finding the plaintiff's claim that designation of an exclusive representative amounted to forced association was 'foreclosed' by *Knight* where the employees were not required to join the union"); *D'Agostino v. Baker*, 812 F.3d 240, 244 (1st Cir. 2016)

("finding *Knight* contained the implied premise 'that exclusive bargaining representation by a democratically selected union does not, without more, violate the right of free association on the part of dissenting non-union members of the bargaining unit'"); *Reisman v. Associated Faculties of the Univ. of Maine*, 356 F. Supp. 3d 173 (D. Maine 2018) ("rejecting the plaintiff's compelled association claim as foreclosed by *Knight*")) (subsequent citation omitted).

*Janus* only serves to affirm the conclusion that exclusive representation schemes are constitutional. There, the Supreme Court observed:

> **It is also not disputed that the State may require that a union serve as exclusive bargaining agent for its employees**—itself a significant impingement on associational freedoms that would not be tolerated in other contexts. We simply draw the line at allowing the government to go further still and require all employees to support the union irrespective of whether they share its views.

*Janus*, 138 S. Ct. at 2478 (emphasis added); *see also Mentele v. Inslee*, 916 F.3d 783, 786–90 (9th Cir.), *cert. denied* 140 S. Ct. 114 (2019) (relying on *Janus* and *Knight* to find that an exclusive collective bargaining representative arrangement does not infringe on nonunion members' First Amendment rights); *Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 2043 (2019) (finding that *Janus* "do[es] not supersede *Knight*").

### B.    Exclusive representation is justified by compelling state interests.

Even if the Court found that *Knight* was not dispositive of the claim in Count II or that *Janus* overruled *Knight*, the claim would fail because exclusive representation serves compelling state interests. "Mandatory associations are subject to exacting scrutiny, meaning they require a compelling state interest that cannot be achieved through significantly less-restrictive means." *Hill v. Serv. Emps. Int'l Union*, 850 F.3d 861, 863 (7th Cir. 2017) (citing *Knox*, 567 U.S. at 310 (noting that "mandatory associations are permissible only when they serve a 'compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational

freedoms'") (internal quotation omitted)); *see also Mentele*, 916 F.3d at 790 (same); *Harris v. Quinn*, 573 U.S. 616, 648–49 (2014) (applying exacting scrutiny to an agency-fee provision that impinged on associational freedoms).

Here, the State enacted the PEBA "to guarantee public employees the right to organize and bargain collectively with their employers, to promote harmonious and cooperative relationships between public employers and public employees and to protect the public interest by ensuring, at all times, the orderly operation and functioning of the state and its political subdivisions." N.M. Stat. Ann. § 10-7E-2. The State Defendants note *Janus*'s approval of the State's interest in "labor peace" as a compelling state interest—that is, "avoidance of the conflict and disruption" that may occur "if the employees in a unit were represented by more than one union." *See Janus*, 138 S. Ct. at 2465 ("[w]e assume that 'labor peace,' in this sense of the term, is a compelling state interest"). (*See also* Doc. 41 at 11.) Mr. Hendrickson contends that *Janus* disapproved of labor peace as a compelling state interest, but this is only partially true. (Docs. 33 at 18; 47 at 12; 48 at 8.) *Janus* found that labor peace was not a sufficient justification to continue charging agency fees—it did not conclude that labor peace was an insufficient interest to justify exclusive representation. 138 S. Ct. at 2466; *see also Mentele*, 916 F.3d at 791 (noting *Janus*'s "reaffirm[ation] that '[s]tates can keep their labor-relation systems exactly as they are—only they cannot force nonmembers to subsidize public-sector unions'") (quoting *Janus*, 138 S. Ct. at 2485 n.27).

The State Defendants also emphasize the State's interest in affordable and efficient management by "allowing a public agency or entity to enter into one contract for an entire bargaining unit, rather than having to negotiate with multiple competing unions or, perhaps worse, with many individuals." (Doc. 41 at 17.) In *Mentele*, the Ninth Circuit also highlighted this compelling state interest: "[The State] has an interest in negotiating with only one entity, at least

for the sake of efficiency and managerial logistics . . . ." 916 F.3d at 791. Eliminating exclusive representation would create "confusion . . . from multiple agreements[] and possible dissension among the" employees. *Id.* (citing *Janus*, 138 S. Ct. at 2465–66). Mr. Hendrickson contends that the interest in "sav[ing] monetary resources by negotiating only with the Union . . . is not an interest that can justify First Amendment violations[,]" but the cases he cites are all inapplicable in this context.[5] (Doc. 33 at 19.) The Court finds that Defendants have advanced compelling state interests sufficient to justify any purported impingement on Mr. Hendrickson's associational freedom.

Moreover, Mr. Hendrickson points to no other means that are significantly less restrictive than the exclusive representation system now in place. The *Mentele* court also stated that it "know[s] of no alternative [to exclusive representation] that is 'significantly less restrictive of associational freedoms.'" 916 F.3d at 791 (quoting *Janus*, 138 S. Ct. at 2465). He does not want the Union to speak for him, but it is unclear what significantly less restrictive system New Mexico might implement. Thus, the Court finds that PEBA's exclusive bargaining system is constitutionally permissible and will grant the Union's motion for summary judgment and deny Mr. Hendrickson's motion with respect to Count II.

## V.    The Court will grant the State Defendants' motion to dismiss.

### A.    The Court will dismiss Mr. Hendrickson's claims in Count I.

Mr. Hendrickson asserts the same claims for prospective relief against the State Defendants in Count I: (1) that Defendants "cannot force public employees to wait for an opt-out window to resign their union membership and to stop the deduction of dues from their paychecks" (Am.

---

[5] Mr. Hendrickson cites: (1) *Romer v. Evans*, 517 U.S. 620, 635 (1996), where the Supreme Court found that a purported state "interest in conserving public resources to fight discrimination against other groups" was "so far removed" from the referendum as to be a legitimate objective; and (2) *Plyler v. Doe*, 457 U.S. 202, 227 (1982), where "an interest in the preservation of the state's limited resources for the education of its lawful residents[,]" standing alone, did not justify the State's "intent[] to discriminate" (quotation marks and citation omitted). Mr. Hendrickson fails to explain how either of these cases is on point.

Compl. ¶ 58); (2) that his rights were violated because he had to pay union dues until the opt-out window specified in the parties' contract (*id.* ¶ 59); and (3) that the statute allowing fair share fees is unconstitutional (*id.* ¶ 60). (*See also* Doc. 37 at 9.) His claims fail for the same reasons the Court described above.

First, Mr. Hendrickson does not have standing to enforce the rights of other public employees. *See Aid for Women*, 441 F.3d at 1111; *Begay*, 710 F. Supp. 2d at 1186–87. Thus, the Court will dismiss the requested declaration regarding the constitutionality of the opt-out window as it applies to other public employees. (*See* Am. Compl. ¶ 58.)

Second, Mr. Hendrickson is no longer a member of the Union and has not shown there is a good chance he will be likewise injured in the future. *See Cox*, 43 F.3d at 1348. Moreover, *Janus* does not apply to void his membership contract with the Union, and his claim would also fail on the merits. *See* 138 S. Ct. at 2486. Thus, the Court will dismiss the requested declaration regarding the withholding of Union dues until the two-week opt-out window. (*See* Am. Compl. ¶ 59.)

Third, the requested declaration regarding N.M. Stat. Ann. § 10-7E-9(G) is moot, because Mr. Hendrickson does not assert that the Union and SPO are still deducting fair share fees from nonunion employees.[6] Accordingly, the Court will dismiss the requested declaration regarding the fair share fee provision. (*See* Am. Compl. ¶ 60.)

---

[6] The State Defendants ask the Court to take judicial notice of a July 6, 2018 letter from the director of the SPO announcing that it would immediately cease payroll deductions of fair share fees pursuant to *Janus*. (*See* Doc. 37 at 10 (citing Doc. 37-A).) Mr. Hendrickson does not object to this request or argue that the SPO has unlawfully deducted fair share fees since *Janus*. (*See* Doc. 43; Am. Compl.) Even if it was improper to take judicial notice of the proffered letter, the Court notes that the PELRB Practice Manual also provides that the PEBA provision regarding fair share fees has been "rendered moot" by *Janus*. PELRB Practice Manual at 9, State of N.M. PELRB (Aug. 31, 2019), https://www.pelrb.state.nm.us/pdf/peba/Practice%20manual%20revd%2011-15-19%20003.pdf. Judicial notice of this record is proper, because the record "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2).

22

**B.      The Court will dismiss the claim in Count II.**

**1.      The State Defendants are not responsible for enforcing the PEBA and are not proper defendants.**

With respect to the remaining claim, the State Defendants first contend that this Court lacks subject matter jurisdiction because they are not proper defendants for purposes of the *Ex parte Young* exception to the Eleventh Amendment. (Doc. 37 at 5.) "Suits against state officials in their official capacity . . . should be treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citation omitted)). And while "[t]he Eleventh Amendment generally bars suits against a state in federal court commenced by citizens of that state[,]" the *Ex parte Young* doctrine permits an exception where the plaintiff sues "a state official in federal court [and] seeks only prospective equitable relief for violations of federal law . . . ." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1285, 1286 (10th Cir. 1999) (quoting *Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior*, 160 F.3d 602, 607–08 (10th Cir.)). To properly name an official as a defendant, he or she "must have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007)).

The State Defendants argue that neither of them has enforcement duties over the PEBA, which is instead the responsibility of the Public Employee Labor Relations Board (PELRB). (Doc. 37 at 7 (citing N.M. Stat. Ann. §§ 10-7E-23(A), 10-7E-4(D)).) The PELRB "consists of three members appointed by the governor[,]" N.M. Stat. Ann. § 10-7E-8, and "has the power to enforce provisions of the [PEBA] through the imposition of appropriate administrative remedies." § 10-7E-9(F).

In *Sweeney v. Madigan*, another post-*Janus* case on collective bargaining, the plaintiffs named the attorney general of Illinois. 359 F. Supp. 3d 585, 592 (N.D. Ill. 2019). The attorney

general argued that the Eleventh Amendment barred the action against her because she did not have prosecutorial authority over the statutory scheme. *Id.* The district court held that although the Illinois Labor Relations Board enforced the statutes, the attorney general "is responsible for prosecuting violations of" orders of the board. *Id.* Thus, the attorney general was properly named. *Id.* The same is not true here. The PEBA authorizes the PELRB to enforce the PEBA, § 10-7E-9(F), and enforcement of PELRB orders is reserved to the courts, not the Attorney General. *See* § 10-7E-23. Mr. Hendrickson has not demonstrated that either the governor or the attorney general have enforcement powers over the PEBA.

The State Defendants cite to an unpublished Tenth Circuit case in support of their position. In *Bishop v. Oklahoma*, two couples sued the governor and attorney general and sought a declaration that an amendment to the state constitution was unconstitutional. 333 F. App'x 361, 362–63 (10th Cir. 2009). The Tenth Circuit held that the state "officials' generalized duty to enforce state law, alone, is insufficient to subject them to a suit challenging a constitutional amendment they have no specific duty to enforce." *Id.* at 365 (citations omitted). The *Bishop* court cited several cases from other circuits in support of its decision. First, in *Women's Emergency Network v. Bush*, the Eleventh Circuit held that "[w]here the enforcement of a statute is the responsibility of parties other than the governor (the cabinet in this case), the governor's general executive power is insufficient to confer jurisdiction." 323 F.3d 937, 949–50 (11th Cir. 2003) (citation omitted). Similarly in *Waste Management Holdings, Inc. v. Gilmore*, the Fourth Circuit concluded that "[t]he mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute." 252 F.3d 316, 331 (4th Cir. 2001) (quoting *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979)). In *Okpalobi v. Foster*, the Fifth Circuit found that the plaintiff could not maintain a suit

against the governor and attorney general where neither official had an "enforcement connection with . . . the statute at issue." 244 F.3d 405, 422 (5th Cir. 2001) (*en banc*) (emphasis omitted). In *1st Westco Corp. v. School District of Philadelphia*, the Third Circuit opined that "[i]f we were to allow [plaintiffs] to join . . . [the State officials] in this lawsuit based on their general obligation to enforce the laws . . . , we would quickly approach the nadir of the slippery slope; each state's high policy officials would be subject to defend every suit challenging the constitutionality of any state statute, no matter how attenuated his or her connection to it." 6 F.3d 108, 112–13, 116 (3d Cir. 1993).

Mr. Hendrickson attempts to distinguish *Bishop* on the basis that the enforcement of the statute was delegated to a branch other than the executive branch. (Doc. 43 at 6.) But this argument fails in looking at the cases the Tenth Circuit cited in support of its holding in *Bishop*: enforcement in *Women's Emergency Network* was the responsibility of the cabinet, which is also part of the executive branch. 323 F.3d at 949–50. In *Waste Management Holdings*, the statutory scheme was enforced by a board, the members of which were appointed by the governor. *See* 252 F.3d at 323; Va. Code Ann. §§ 10.1-1401, 10.1-1455. The Court is not convinced that enforcement by another branch is the determining factor.

Mr. Hendrickson urges the Court to follow the Tenth Circuit's reasoning in *Petrella v. Brownback*, 697 F.3d 1285 (10th Cir. 2012), where it found that the attorney general and governor were proper defendants in a lawsuit "challenging the statutory scheme by which the state of Kansas fund[ed] its public schools." *Id.* at 1289, 1293–94. The Tenth Circuit rejected the state officials' argument that they were not proper defendants:

> It cannot seriously be disputed that the proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute. *See Ex parte Young*, 209 U.S. 123, 161 (1908). Nor can it be disputed

25

> that the Governor and Attorney General of the state of Kansas have responsibility for the enforcement of the laws of the state. See Kan. Const. Art. I § 3; Kan. Stat. Ann. § 75-702.

*Id.* But as the State Defendants note, the school funding statute is "encompassed by [the executive branch's] general enforcement power. If a local school district were to violate the [statute at issue in *Petrella*], it would be the governor and the attorney general that would take any enforcement action, as provided by the Kansas State Constitution." (Doc. 46 at 3 (citing *Petrella*, 697 F. Supp. 3d at 1294).) But "enforcement of New Mexico public employee union contracts is not encompassed by this general authority." (*Id.*) Instead, enforcement of the PEBA rests with the PELRB. Accordingly, the Court holds that Governor Lujan Grisham and Attorney General Balderas are not proper defendants in this matter.

### 2. Mr. Hendrickson has failed to state a claim in Count II.

Even if the State Defendants were properly named, the Court would dismiss Count II for failure to state a claim. As the Court found above, *Knight* forecloses the claim. And if *Knight* was not dispositive or if *Janus* overruled *Knight*, the arrangement is justified by compelling state interests. Consequently, the Court will grant the motion to dismiss with respect to Count II.

**THEREFORE,**

**IT IS ORDERED** that Defendant AFSCME Council 18's Motion for Summary Judgment, Statement of Undisputed Material Facts, and Memorandum of Points and Authorities in Support of AFSCME Council 18's Motion for Summary Judgment (Doc. 32) is **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (Doc. 33) is **DENIED**;

**IT IS FURTHER ORDERED** that Defendants Michelle Lujan Grisham and Hector Balderas's Motion to Dismiss (Doc. 37) is **GRANTED**; and

**IT IS FURTHER ORDERED** that this case is **DISMISSED**.


_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE